**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| v. | ) ) | CR420-124-21 |
| THOMAS HOLLAND, | ) ) ) | |
| Defendant | ) | |

## REPORT AND RECOMMENDATION

Defendant Thomas Holland has moved to suppress intercepted communications obtained by law enforcement via Title III wiretaps, *see* doc. 626, and evidence obtained by law enforcement from the seizure of his cellular telephone, *see* doc. 627.  The Government opposes each.  *See* docs. 681, 682.  The Court held an evidentiary hearing on September 20, 2021.  Doc. 752 (Minute Entry).  The motions are now ripe for review.

## I.   BACKGROUND

From November 2019 through July 2020, law enforcement agents sought, and this Court issued, a series of eleven orders authorizing the Government to intercept telephone communications as part of an investigation into an alleged drug trafficking conspiracy.  *See* doc. 626 at 2-5; doc. 682 at 4.  On November 20, 2019, the Government filed its first

1

application in the series, seeking an order authorizing a wiretap of target telephone one ("TT1"), which the Court issued that same day.  Doc. 626 at 2.  Law enforcement intercepted wire and electronic communications from TT1 between November 20, 2019 and December 19, 2019.  Doc. 752-2.  On December 23, 2019, agents presented to the Court two discs containing the recordings of those interceptions for sealing.  *Id.* at 2-4.

Between December 23, 2019 and March 25, 2020, the Government sought and obtained six additional wiretap authorization orders as part of its continued investigation.  *See* doc. 626 at 2-4.  Pursuant to those Orders, law enforcement intercepted wire and electronic communications from target telephones two ("TT2"), three ("TT3"), four ("TT4"), five ("TT5"), six ("TT6"), and seven ("TT7").  *Id.*  The recordings from each of these wiretaps were sealed with the Court.  *Id.*

On April 23, 2020, the Government applied for a wiretap authorization order for target telephone eight ("TT8"), which was alleged to be used by Holland's co-defendant Jontae Keel.  Doc. 626 at 4; *see also* doc. 753 (application filed under seal).  The Court issued an Order authorizing the intercepts that same day, and interception of TT8 began on April 24, 2020.  Doc. 626 at 4; *see also* doc. 752-2 at 17.  The

Government filed an application to renew the wiretap of TT8 on May 22, 2020, which was granted. Doc. 626 at 4. Interception of TT8 continued until June 20, 2020. Doc. 752-2 at 11. After the Court granted an extension of time in which the Government could present the recordings for sealing – a topic discussed in more detail below – the recordings from TT8 were sealed on June 26, 2020. *Id*. at 17-18, 23-24.

Using information obtained from intercepts from TT8, including conversations between Holland and Jontae Keel purportedly about Holland's travels to California to secure marijuana for the alleged drug trafficking organization, the Government applied for a search warrant for Holland's cell phone. *See* doc. 67-1 at 9-13. This Court issued the search warrant on May 1, 2020. *Id*. at 20-23.

The Government applied for its final wiretap authorization on June 5, 2020, for target telephone nine ("TT9"). Doc. 626 at 4. The Court granted the request, and a subsequent extension request, resulting in intercepts of TT9 from June 5, 2020 through July 23, 2020. *Id*. The recordings from TT9 were sealed on July 29, 2020. *Id*. at 5.

As a result of the Government's investigation, on November 5, 2020, a grand jury indicted 29 defendants in a 27-count indictment. Doc. 3.

Holland is charged with one count of conspiracy to possess with intent to distribute and to distribute cocaine, cocaine base, and marijuana in violation of 21 U.S.C. § 846 and one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). *See id.*

Holland challenges the validity of the wiretaps on two, independent grounds.[1]  First, he argues that the wiretaps were based on applications that failed to demonstrate necessity, a requirement imposed by 18 U.S.C. § 2518(1)(c).  *See* doc. 626 at 10-13.  Second, he argues that the Government failed to timely seal the recordings of the interceptions from two[2] of the wiretaps, TT1 and TT8, as mandated by 18 U.S.C. § 2518(8)(a).  *See* doc. 626 at 6-10.  He argues that any intercepted communications pertaining to him, as well as the fruits of any such interceptions, should be suppressed pursuant to 18 U.S.C. § 2518(10)(a).

---

[1] Holland challenges the wiretaps as an "aggrieved person" under 18 U.S.C. § 2518(10)(a).  *See* doc. 626 at 5-6.  An "aggrieved person" is "a person who was a party to any intercepted wire, oral, or electronic communication . . . ."  18 U.S.C. § 2510(11). The Government does not contest Holland's status as an "aggrieved person."  Doc. 681 at 3.  Accordingly, the Court finds that Holland has standing to challenge the wiretaps at issue.

[2] Initially, Holland challenged the timeliness of the sealing of the intercepts from six wiretaps – TT1, TT2, TT4, TT6, TT8, and TT9.  However, at the hearing, Holland abandoned his argument as to the timeliness of sealing of TT2, TT4, TT6 and TT9. He confirmed, and the Government agreed, that the sealings at issue are only those for TT1 and TT8.

*Id.* at 13-14.  He also separately moves to suppress the search warrant for his cell phone, since the application for the search warrant was based on information received from the intercept of TT8, which he contends was invalid.  *See* doc. 627 at 2-4.

## II.   DISCUSSION

### A.   Title III Wiretaps

#### 1. Necessity

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968 . . . prescribes the procedure for securing judicial authority to intercept wire communications in the investigation of specified serious offenses."  *United States v. Giordano*, 416 U.S. 505, 507 (1974).  Among the various requirements the government must meet before a wiretap may be authorized is the "necessity" requirement.  The government satisfies this requirement by including in its application "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c).  This requirement "is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will

succeed." *United States v. Van Horn*, 789 F.2d 1492, 1496 (11th Cir. 1986). "Traditional investigative techniques include: physical surveillance, cooperating witnesses, informants, controlled drug purchases, pen registers and trap and trace devices." *United States v. Collins*, 300 F. App'x 663, 666 n. 2 (11th Cir. 2008).

"Section 2518 does not foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted; however, it does require the Government to show why alternative measures are inadequate for this particular investigation." *United States v. Perez*, 661 F.3d 568, 581 (11th Cir. 2011) (internal quotes and cites omitted); *see also Van Horn*, 789 F.2d at 1496 ("The affidavit need not, however, show a comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves."). Moreover, "'the partial success of alternative investigative measures' does not foreclose the use of a wiretap." *United States v. Goldstein*, 989 F.3d 1178, 1195 (11th Cir. 2021) (quoting *Perez*, 661 F.3d at 581-582). In the context of a conspiracy investigation, where more traditional investigative techniques have uncovered useful historical

information, a wiretap may still be needed to identify all of the co-conspirators and to reveal the full scope of the conspiracy. *Id.*

The judge considering a wiretap application "is clothed with broad discretion in its consideration of the application." *U.S. v. Alonso*, 740 F.2d 862, 868 (11th Cir. 1984) (citation omitted).   An order authorizing a wiretap "will not be overturned simply because defense lawyers are able to suggest *post factum* some investigative technique that might have been used and was not." *Id.* at 869.   The defendant has the burden of overcoming the presumption of validity that attaches to a district judge's findings that the necessity provisions have been satisfied. *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001); *see also United States v. Aguirre-Benitez*, 2017 WL 9477737, at *11 (N.D. Ga. Apr. 24, 2017) ("A wiretap order is presumed to be valid, and a defendant has the burden of overcoming this presumption and of proving that the wiretap order was unlawfully obtained." (internal quotes, alteration, and citation omitted)).

Holland initially challenged the necessity of each wiretap, beginning with TT1. *See* doc. 626 at 11.   He argued that the application for interception of TT1 did not meet the necessity requirement, because "far from showing that other techniques had failed or were unlikely to

succeed, [it] actually demonstrated that the investigation was proving to be very successful at achieving its objectives without such an extraordinary investigative device." *Id.* (internal quotes omitted). He further argued that the subsequent applications (TT2, TT3, TT4, TT5, TT6, TT7, TT8, and TT9) contain language substantially similar to the language used in the application for TT1, and therefore they are all defective. *Id.* at 12-13. To the extent the subsequent affidavits offer additional facts about the continuation of the investigation through traditional means, he argued that the additional details further demonstrate that the wiretaps were unnecessary, considering the success of the ongoing investigation. *Id.* at 13.

During the hearing, however, Holland concentrated his challenge on the application for the wiretap of TT8, the only wiretap application that Holland introduced as evidence for the Court's consideration. *See* doc. 752 at 1; doc. 753 (exhibit filed under seal). Because Holland concentrated his argument on TT8, and because the application for the interception of TT8 is the only application currently before the Court, the Court also focuses its attention on that application.

The application for TT8 details fourteen methods of investigation and explains why those methods were used and failed or would be unlikely to succeed or too dangerous to employ: confidential human sources/sources of information, doc. 753 at 40-46; physical surveillance, *id.* at 46-51; controlled purchases, *id.* at 51-54; undercover agents, *id.* at 54-58; consensually recorded conversations, *id.* at 58-59; search warrants, *id.* at 59-60; interviews, grand jury subpoenas, and immunity, *id.* at 61-62; trash searches, *id.* at 62-63; other surveillance techniques, *id.* at 63-64; pen registers, trap and trace devices, and toll analysis, *id.* at 64-66; GPS and geo-location data, *id.* at 66; mail cover requests, *id.* at 67; vehicle tracker, *id.* at 67-68; and financial investigation, *id.* at 68-69. *See* doc. 681 at 33-35.

In arguing that the information satisfies the necessity requirement, the Government highlights the admittedly ambitious goal of disrupting the alleged drug-trafficking organization ("DTO") as the objective against which to measure whether these more traditional techniques were successful. Each application (including TT8) more specifically set out the goals and objectives of the investigation:

> a. To discover the full scope and identification of key personnel involved in illegal drug trafficking on

behalf of BULLOCH, the TARGET SUBJECTS, and other members of the BULLOCH DTO yet unknown;

b. To discover the identities and roles of all suppliers of illegal drugs or controlled substances to the identified conspirators;

c. To discovery the main customers and co-conspirators of KEEL, other TARGET SUBEJCTS, and others yet unknown;

d. To discover the stash locations where illegal drugs are stored prior to distribution, in order to seize the largest quantities possible to disrupt the DTO's distribution efforts;

e. To discover the management and disposition of proceeds generated by the organization's narcotics trafficking, in order to seize proceeds and assets derived from, and utilized to, fund and facilitate the criminal activity of the DTO; and

f. To obtain admissible evidence which demonstrates beyond a reasonable doubt that KEEL and the other TARGET SUBJECTS and any later identified targets, committed the alleged violations of law set forth herein.

Doc. 681 at 31-32. Courts have found such lofty goals reasonable when determining whether a wiretap application demonstrates the requisite necessity. *See United States v. Allen*, 274 F. App'x 811, 816 (11th Cir. 2008) (where traditional methods produce evidence of street-level transactions, which is unhelpful to the government's goal of revealing the entire conspiracy, the district court is not required to force the

government to redefine its objectives; "the government's ultimate objective and the traditional methods' usefulness to that objective are important to the necessity inquiry."); *United States v. Degaule*, 797 F. Supp. 2d 1332, 1360 n. 22 (N.D. Ga. 2011) ("[A]lthough the government had uncovered a portion of the drug and money laundering conspiracy, that fact did not require the investigation to end before the entire conspiracy and all co-conspirators were discovered."). " '[The Eleventh Circuit] has repeatedly held that, where conventional techniques will not show the entire scope of the conspiracy, a wiretap is permissible, even in those situations where conventional techniques will allow for the arrest and conviction of some members.' " *United States v. Kelley*, 2009 WL 2589086, at *2 (S.D. Ala. Aug. 17, 2009) (quoting *United States v. Olmedo*, 552 F. Supp. 2d 1347, 1365-66).

Holland argues that the necessity analysis should not focus on the investigation into the organization as a whole; instead, he argues that the analysis turns on the success or failure of the investigation into Keel individually, since his phone is the target of TT8. Although the necessity inquiry is not directed to an individual, but to the objective of the whole

investigation, *see Degaule*, 797 F. Supp. 2d at 1360, n. 22, even under Holland's requested lens the wiretap survives his challenge.

At the time the Government applied for TT8, investigators had developed five confidential human sources ("CHS"). Doc. 753 at 41. Of the five, two did not have access to Keel, and investigators believed that they were too far removed from the targeted criminal activity. *Id.* at 41-42. The affidavit in support of the wiretap application describes the challenges faced by confidential human sources in drug trafficking cases generally, *see* doc. 753 at 42-44, but also specifies challenges faced by CHSs in this particular investigation, *see id.* at 44-45. In light of these challenges, investigators did not have informants who could make detailed inquiries concerning other purchasers, sources of supply, shipments of drugs, stash locations, and/or methods of operations used by members of the alleged DTO, including Keel. *Id.* at 44.

The TT8 application also details the difficulties surrounding physical surveillance of suspected DTO members, including Keel. Doc. 753 at 46-50. Investigators attempted surveillance at Keel's apartment, but the apartment complex layout made it difficult to maintain physical surveillance of the apartment. *Id.* at 49. Moreover, investigators

believed that Keel had been tipped off about the investigation by a co-defendant who had already been arrested, making surveillance even more difficult, and particularly susceptible to discovery. *Id.* at 49-50. This is in addition to alleged DTO members conducting criminal activity inside numerous residences and vehicles where investigators are unable to view the transactions, as well as in close-knit neighborhoods where investigators believe firearms are present. *Id.* at 50-51.

The TT8 application also discusses controlled purchases of narcotics. Doc. 753 at 51-54. Although investigators attempted nine controlled purchases from alleged DTO members, some were unsuccessful, and some resulted in higher level targets in the organization pushing the prospective purchaser off onto subordinates. *Id.* at 51. While there were two controlled buys that were deemed a success, investigators did not believe that additional controlled buys would uncover enough information about the inner workings of the alleged DTO. *Id.* at 52. As to Keel, investigators did not believe their source would be ale to conduct controlled purchases from him. *Id.* at 53.

The TT8 application also describes an attempt to use an undercover agent in the investigation. Doc. 753 at 54-58. The attempt detailed does

not involve Keel.  *Id.*  Because of the ultimate failure of the undercover agent's attempts, and because of the members' wariness of new individuals, investigators determined that introducing undercover agents would be difficult and dangerous.  *Id.*

The TT8 application further explains that some of the confidential sources were able to consensually record conversations with some members of the alleged DTO.  Doc. 753 at 58.  These sources did not have access to Keel.  *Id.*  The application also admitted that investigators had identified what they believed to be stash houses, including one maintained by Keel, and had probable cause for search warrants.  *Id.* at 60.  Even though investigators believed they had sufficient probable cause, they also believed that the requested wire taps would aid them in developing more probable cause.  *Id.*

The TT8 application also explained why interviews, grand jury subpoenas, and offers of immunity would not be successful techniques, since the targets would likely invoke their Fifth Amendment privileges or lie under oath.  Doc. 753 at 61-62.  Trash searches were likewise considered futile, particularly as to Keel, since he lives in an apartment

complex with a communal dumpster.  *Id*. at 63.  Video surveillance was also considered unhelpful.  *Id*. at 64.

The investigators did detail their ability to obtain pen register trap and trace orders on several numbers, including one belonging to Keel. Doc. 753 at 64-65.  However, this information only provided investigators with the list of numbers called by a particular number, along with the incoming call numbers, but not any contents.  *Id*. at 65.  Similarly, while they obtained GPS location data for Keel, it was not specific enough to provide investigators with sufficient information about Keel's location and activities.  *Id*. at 66.  Finally, the application details why mail cover requests had not returned information, and why investigators had not placed a GPS device on Keel's car.  *Id*. at 66-67.

Considering the detailed information provided by investigators about techniques that had either been used to limited success, or were deemed either futile or too dangerous to use in the ongoing investigation, and considering the presumption of validity that accompanies a wiretap order, Holland has not met his burden in demonstrating that the application failed to show necessity.  His motion to suppress should be **DENIED.**

## 2. Sealing

Holland next challenges the timeliness of the sealing of the recordings from TT1 and TT8. Section 2518(8)(a) requires that "[t]he contents of any wire, oral, or electronic communication intercepted by any means authorized by this chapter shall, if possible, be recorded on tape or wire or other comparable device" and that recording "shall be done in such way as will protect the recording from editing or other alterations." 18 U.S.C. § 2518(8)(a). The section further provides that "[i]mmediately upon the expiration of the period of the order, or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions." *Id.* The sealing requirement was imposed by Congress to "ensure the reliability and integrity of evidence obtained by means of electronic surveillance." *United States v. Ojeda Rios*, 495 U.S. 257, 263 (1990).

Recordings are sealed "immediately" if it is done within one or two days of the expiration of the order authorizing the intercepts. *United States v. Matthews*, 431 F.3d 1296, 1307 (11th Cir. 2005). Intervening weekends do not count in the calculation of whether recordings were immediately sealed. *See United States v. Wong*, 40 F.3d 1347, 1375 (2d

Cir. 1994) ("We have recognized that weekends and holidays present legitimate obstacles to the sealing of tapes."); *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994) ("Intervening weekends . . . are satisfactory explanations for slight delays in presenting wiretap recordings for sealing."); *United States v. Carson*, 969 F.2d 1480, 1498 (3rd Cir. 1992) (intervening weekends not counted when determining whether tapes were sealed "as soon as was practical."); *United States v. Riley*, 2019 WL 2093248, at *9 (S.D. Ga. Apr. 19, 2019) ("Weekends need not be counted in determining whether sealing orders were filed immediately on the wiretap's expiration."); *United States v. Bryant*, 2014 WL 317694, at * 7 (S.D. Ga. Jan. 28, 2014) ("It is well settled that weekends need not be counted in determining whether sealing orders were filed immediately on the wiretap's expiration.").

Holland argues that TT1 was not timely sealed, since interception terminated on December 19, 2019, and the recordings were not presented to a judge for sealing until December 23, 2019, four days later. Doc. 626 at 7. During the hearing on Holland's motions, FBI Agent Savannah Solomon, who was the administrative agent on the case and responsible for coordinating the sealing of the intercepts, testified as to the sealing of

TT1. Agents terminated the intercept of TT1 after business hours on December 19, 2019. Solomon requested the recordings the next day,[3] Friday, December 20, 2019, her first opportunity to do so. She received the discs containing the recordings on Monday, December 23, 2019, and the Court sealed the recordings that same day. See doc. 752-2 at 6-7. While four calendar days passed before sealing, two of those days fell on a weekend. Thus, the TT1 recordings were sealed only two countable days after the expiration of the period of the Order authorizing the wiretap, which is within the time period established by the Eleventh Circuit for fulfilling the immediacy requirement. *Matthews*, 431 F.3d at 1307. Therefore, the recordings obtained from the wiretap of TT1 were timely sealed in accordance with § 2518(8)(a).

Holland also challenges the sealing of the recordings from the wiretap of TT8, since the interception terminated on June 20, 2020, but the recordings were not sealed until June 26, 2020. Doc. 626 at 9. The Government concedes that these recordings were not timely sealed. Doc. 681 at 22-24. Therefore, it must provide a "satisfactory explanation,"

---

[3] As Solomon explained, and as the Court recites in more detail below, the recordings are downloaded to discs in the FBI's Quantico and Atlanta offices, and are then sent via FedEx delivery to the FBI's Savannah office.

which requires it to explain why a delay occurred and why it is excusable. *Ojeda Rios*, 495 U.S. at 265. The Eleventh Circuit has not provided a standard to use in evaluating whether the Government's proffered reason for the delay is satisfactory under § 2518(8)(a). *See United States v. Mayfield*, 2017 WL 9477736, at \*25 (N.D. Ga. Feb. 28, 2017). So, as the Northern District did in *Mayfield*, the Court looks to guidance from other circuits. *Id.*

The Second Circuit has found explanations of delays to be "satisfactory" where "the government advanced a bona fide reason, there was no reason to believe there was any deliberate flouting of the Title III requirements, no reason to doubt the tapes' integrity, and no basis for inferring any other prejudice to the defendants." *United States v. Maldonado-Rivera*, 922 F.2d 934, 950 (2d Cir. 1990). The Fourth Circuit looks to "the length of any delay before sealing, the care taken in handling the recordings, prejudice to the defendants, any tactical advantage accruing to the government, and whether deliberate or gross dereliction of duty or honest mistake cause the failure to file." *United States v. Suarez*, 906 F.2d 977, 982 (4th Cir. 1990). The Seventh Circuit finds an explanation to be "satisfactory" where "it dispels any reasonable

suspicion of tampering.  The believability of the explanation is critical, and depends in part simply on its plausibility: the more plausible, the more believable." *United States v. Coney*, 407 F.3d 871, 875 (7th Cir. 2005).  It also looks to "[t]he length of the delay . . . the nature of the crime, including its notoriety or the notoriety of the defendant, and thus the pressure on the government to obtain a conviction; and also the importance of the tapes to the government's case." *Id.*

The court in *Mayfield* condensed the circuits' analyses down to the following factors to be considered: "the stated reason for the delay, the plausibility or believability of the reason, and whether the record shows that that is the actual reason for the delay; whether the reason is objectively reasonable; the length of the delay; and whether there is any evidence that the government delayed sealing to gain a tactical advantage over the defendant or to tamper with the recordings, i.e., whether the government acted in bad faith."  *Mayfield*, 2017 WL 9477736, at *26.

To explain the reason for the delay between the termination of the interception of TT8 on June 20, 2020, and the sealing on June 26, 2020, Agent Solomon testified as to the process used by the FBI for wiretaps in

cases handled by the Savannah Resident Agency.  According to Solomon, agents in Savannah first hear and/or read the intercepts in the wireroom at the FBI's Savannah Resident Agency in Savannah, Georgia.  This wireroom is located within a highly secured building, and only agents with proper authorization who have been minimized as part of the investigation are permitted to enter.  Even though intercepts are first heard in the Savannah wireroom, agents in Savannah do not have access to download them.   Instead, intercepts are stored by the FBI's Operational Technology Division on a secure network.   Wire and electronic communications must be downloaded by the FBI's Electronic Surveillance team in Atlanta, Georgia, and data associated with those interceptions must be downloaded by employees or contractors at FBI headquarters in Quantico, Virginia.  The downloaded intercepts are each encrypted and digitally signed.

During this investigation, at the end of each intercept Solomon submitted requests to Atlanta for downloaded copies of the recordings. An automatic process sent a similar request for download to Quantico. Quantico would download the data to a disc, seal it in an envelope, and send it via FedEx to Atlanta.  Similarly, a member of the Electronic

Surveillance team in Atlanta would download the communications to a disc and seal that disc in an envelope.  Then, the Atlanta office would send both sealed envelopes to the Savannah Resident Agency via FedEx, where Solomon would then, working with the United States Attorney's Office, present the sealed envelopes to the Court for sealing.  During this process, the recordings were never within the control of the United States Attorney's Office; they remained in FBI custody until they were sealed by the Court.

In the case of TT8, the FBI's interception terminated on Saturday, June 20, 2020.  Agent Solomon requested the discs the next business day, Monday, June 22, 2020.   However, due to the ongoing COVID-19 pandemic and the resulting staffing limitations at the FBI's offices, there was a delay in the fulfillment of the requested recordings.   Solomon testified that both the FBI headquarters and the Atlanta office (as well as her office in Savannah) were operating with skeleton crews, and staffing was severely limited.   The download of the discs required someone to be physically in the office, both in Quantico and Atlanta. Solomon maintained constant communication with supervisors in the Atlanta office requesting that they permit an appropriate person to enter

the building to conduct the download so that she could obtain the recordings as soon as possible.

Realizing that the delay in fulfillment by Quantico and Atlanta would cause the sealing to fall outside of the requisite period, the Government filed a motion on June 24, 2020, seeking an extension of time in which it could present the discs for sealing.  *See* doc. 752-2 at 9-12. The Court granted the motion and ordered the Government to present the discs for sealing within one day following receipt of the discs by the Savannah Resident Agency.   Doc. 752-2 at 14-15.   The discs were ultimately sent by Atlanta via FedEx overnight to Solomon on June 25, 2020.  She received them on June 26, 2020, and they were sealed that same day. *See* doc. 752-2 at 23-24.

The Government has presented a plausible and believable reason for the six-day delay between the end of the interception of TT8 and the sealing of the recordings of those intercepts.  To begin, Saturday, June 20, 2020 and Sunday, June 21, 2020 should not be counted.  That means the Government must explain the four-day delay from Monday, June 22, 2020, when Solomon requested the discs, through Friday, June 26, 2020, when the Court sealed the recordings.  Based on Solomon's testimony,

limited staffing, particularly in the FBI's Atlanta office, delayed that office's ability to fulfill her request for the downloaded recordings.

Holland does not dispute that the this was the actual reason for the delay, although he did, at the hearing, challenge whether Solomon could have obtained the recordings through alternative means. In response, she testified that there was a potential work-around, but that, in this instance, the discs containing the recordings arrived to her in Savannah before the potential work-around could be successfully used. Based on her testimony, the Court is persuaded that the delay was solely caused by the limited staffing levels permitted during the COVID-19 pandemic, and that no other plausible work-around existed to expedite the recordings.

Furthermore, there is no evidence that the Government delayed sealing to gain a tactical advantage over the defendant or to tamper with the recordings. Instead, the record shows that the entire process is set up to limit access to the recordings, which is why agents in Savannah are unable to download the interceptions. Holland points to no evidence of tampering or other manipulation of the digitized, encrypted recordings. The Government was transparent throughout the delay, keeping the

Court apprised of the status by filing its motion for an extension of time to seal the recordings within two days of Solomon's initial request. The record does not demonstrate any bad faith on the part of the Government. The explanation provided for the delay is satisfactory. *See* 18 U.S.C. § 2518(8)(a).

The recordings from TT1 were timely sealed. The recordings from TT8 were not timely sealed, but the Government has presented a satisfactory explanation for the delay. Therefore, Defendant Holland's Motion to Suppress the wiretaps as improperly sealed should be **DENIED**.

## B.    Search Warrant

Holland challenges the search warrant issued for his cell phone since the probable cause for that warrant was based on information and evidence gathered from the wiretap of TT8. *See* doc. 627 at 2. The grounds asserted for suppressing the search warrant are the same as the grounds asserted for suppressing the wiretaps. *Compare* doc. 627 at 2-3 (arguing evidence obtained from the wiretap of TT8 must be suppressed because the recordings were not immediately sealed and the application failed to show necessity) *with* doc. 626 at 5 (arguing for suppression for

two reasons: the recordings were not immediately returned and sealed, and the applications failed to show necessity).  Because Holland's motion to suppress the wiretaps, including the wiretap of TT8, should be denied, so too should his motion to suppress the search warrant based on the intercepts from TT8 be **DENIED**.

## III.  CONCLUSION

Defendant Thomas Holland's Motion to Suppress Title III Wiretap Evidence should be **DENIED**, doc. 626, and his Motion to Suppress Search Warrant Issued for Target Cell Phone: 912-398-6253 should be **DENIED**, doc. 627.

This Report and Recommendation (R&R) is submitted to the district court judge assigned to this action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 72.3.  Within 14 days of service, any party may file written objections to this R&R with the Court and serve a copy on all parties.  The document should be captioned "Objections to Magistrate Judge's Report and Recommendations."  Any request for additional time to file objections should be filed with the Clerk for consideration by the assigned district judge.

After the objections period has ended, the Clerk shall submit this R&R together with any objections to the assigned district judge. The district judge will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to timely file objections will result in the waiver of rights on appeal. 11th Cir. R. 3-1; *see Symonette v. V.A. Leasing Corp.*, 648 F. App'x 787, 790 (11th Cir. 2016); *Mitchell v. United States*, 612 F. App'x 542, 545 (11th Cir. 2015).

**SO REPORTED AND RECOMMENDED** this 19th day of October, 2021.

CHRISTOPHER L. RAY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA