IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | CIVIL ACTION NO.: 4:20-cr-124 |
| v. | |
| THOMAS HOLLAND, | |
| Defendant. | |

**O R D E R**

After a careful de novo review of the entire record, the Court concurs with the Magistrate Judge's October 19, 2021, Report and Recommendation, (doc. 823), to which Defendant Thomas Holland has filed objections, (doc. 918). The Government has responded in opposition to those objections. (Doc. 927.) Holland's objections have no merit and are, for the reasons explained below, **OVERRULED**. Accordingly, his motions to suppress are **DENIED**. (Docs. 626 & 627.)

As the Report and Recommendation explains, from November 2019 through July 2020, law enforcement agents sought, and this Court issued, a series of eleven orders authorizing the interception of telephone communications as part of an investigation into an alleged drug trafficking conspiracy. (See doc. 823 at 1.) Ultimately, that investigation resulted in an indictment of 29 individuals, including Thomas Holland. (Id. at 3-4.) Holland moved to suppress certain intercepted communications, (see generally doc. 626), and the search warrant for his cell phone, since it was based on the allegedly improper intercepts, (see generally doc. 627). The Magistrate Judge recommends that each motion to suppress be denied. (Doc. 823 at 26.)

Holland first argues that certain intercepted communications should be suppressed, since the application requesting the wiretap for Target Telephone 8 ("TT8") failed to demonstrate necessity under 18 U.S.C. § 2518(1)(c). (See doc. 823 at 8.) This requires the application to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The Magistrate Judge discussed the application for TT8 in detail, identifying fourteen methods of investigation that the applicant described, and analyzing whether the explanation regarding each of these investigative techniques sufficiently met the "necessity" requirement. (Doc. 823 at 9-15.) The Magistrate Judge concluded that it did. (Id. at 15.)

Holland objects, arguing that the wiretap for TT8 was premature since (1) "the agents and the government had established a stash house belonging to Keel (TT8's user) and had ample probable cause to obtain search warrants there and for other locations," (2) "[t]he investigators never attempted controlled purchases from Keel, despite the fact that they had sufficient information to do so," (3) investigators "did not take advantage of surveillance of places and homes and other locations that Keel frequented – although they had this information and had pen register trap and trace orders on his number and the phone numbers of several of his associates and GPS location data," and (4) "investigators failed to explain why pole cameras and static surveillance [were] not used" in an apartment complex. (Doc. 918 at 3-4.)

Upon a de novo review of the application for the wiretap of TT8 (see doc. 753), this Court agrees with the Magistrate Judge's conclusion that the application sufficiently explains why these other techniques either had been used to only limited success or were deemed either futile or too dangerous. (See doc. 823 at 15). As to the stash houses, the application explains that, while

investigators had identified what they believe to be a stash house used by Keel, the wiretap would aid agents in developing further probable cause for search warrants that would allow them to seize narcotics. (Doc. 753 at 60.) The application also explains that wire interception would assist investigators in identifying addresses for other targets, which could lead to search warrant executions on all of the targets' residences. (Id.) As to controlled purchases, the application explains that one confidential source "may" be able to purchase narcotics, but that the source does not have enough access to the inner workings of the organization to achieve the goals of the investigation. (Id. at 53.) It further explains that another source is unable to conduct controlled purchases from Keel. (Id.) Finally, as to surveillance efforts, the application explained that Keel had likely been warned of another member's arrest and would "most likely operate with a heightened sense of awareness in order to avoid surveillance." (Id. at 50.)

Section 2518(1)(c) does not require that an application contain a "comprehensive exhaustion of all possible techniques, but must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves." United States v. Nixon, 918 F.2d 895, 901 (11th Cir. 1990) (internal quotation marks and citation omitted). Considering the presumption of validity attached to wiretap orders, see United States v. Flores, 2007 WL 2904109, at *5 (N.D. Ga. September 27, 2007) (citing United States v. Mitchell, 274 F.3d 1307, 1310 (10th Cir. 2001), Holland has not met his burden of showing that the necessity provisions were not met by the application for the interception of TT8.

Holland also argues that certain wiretaps should be suppressed since the recordings were not timely sealed. (See doc. 823 at 16.) He objects to the Magistrate Judge's recommendation that the delay in sealing of the intercepts of TT8 was satisfactorily explained by the Government. (Doc. 918 at 4-5.) The Government concedes that the recordings were not timely sealed and

3

presented testimony from Agent Savannah Solomon to explain the delay in presenting the recordings to the Court. (See doc. 836.) Solomon testified that, following a termination of monitoring, she submits a request in writing to the FBI's Atlanta office to download the sessions that are recorded during the monitoring period, and an automated process submits a similar request to its office in Quantico to download the data from those sessions. (Id. at 11.) Monitoring of TT8 ended on June 20, 2020, a Saturday. (Id. at 27.) Solomon requested the disc from Atlanta on the next business day, June 22, 2020. (Id. at 28.) Because of the ongoing COVID pandemic, at that time the Atlanta FBI office was staffed at a critically low volume. (Id.) Solomon was familiar with the staffing levels in the Atlanta office because two of her "bosses" are based in Atlanta, and "all of [the FBI's office in] Savannah's marching orders and information come directly from Atlanta." (Id. at 20-21.) The staffing levels in Atlanta led to a delay in the creation of the discs containing the downloaded intercepts for TT8. (Id. at 28.) Solomon testified that she "asked the supervisor of the electronic surveillance unit in Atlanta to escalate the request." (Id.) She further explained that, because of the pandemic and the resulting staffing shortages, she was on the phone with the supervisor and "working through the various chains of command to ensure that someone could come into the office." (Id. at 41-42.) As a result, someone was able to go into the office to fulfill her request. (Id. at 28-29.) Solomon presented the discs for sealing the day she received them. (Id. at 31.)

Holland's objection focuses not on Solomon's testimony during the hearing on his motion, but, instead, focuses on her subsequent testimony during a hearing on Holland's co-defendant Joseph Parrish's similar motion to suppress.[1] (Doc. 918 at 5.) During that subsequent testimony,

---

[1] Holland does not cite any authority to support his attempted use of the agent's subsequent testimony to discredit or impeach her testimony that the Magistrate Judge relied upon in formulating his Report and Recommendation. (See generally doc. 918 at 4-6.) Because the Court disagrees with Holland's characterization of the subsequent testimony, the Court need not decide whether that testimony is properly

4

Holland claims she contradicted her prior testimony, and thus the findings of the Magistrate Judge, and characterizes Agent Solomon as "either very cavalier or untruthful in her testimony." (Id. at 6.) The Court disagrees. Holland argues that Solomon "could not recall a specific email, phone call or any communication to Atlanta in connection with TT8 other than the initial lead request for the data." (Id. at 5.) But while she could not recall any "specifics" on the request for the data for TT8, other than the initial lead request, (doc. 901 at 27-28), she consistently testified during both hearings that she, or someone in her office acting at her direction, would have communicated with an Atlanta-based supervisor via phone to follow up on the request. (See doc. 836 at 41-42; doc. 901 at 25, 35-36, 38.)

Holland also argues that Solomon testified during the Parrish hearing that "she had no personal knowledge of the staffing in Atlanta during the period of TT8" and "she neither visited the Atlanta office nor reviewed any communications from Atlanta regarding staffing prior to her testimony in September in the Holland hearing." (Doc. 918 at 5-6.) This is a mischaracterization of Solomon's testimony. While Holland is correct that Solomon testified that she did not visit the Atlanta office during the relevant period, and did not review any specific correspondence about staffing levels prior to her testimony in his case, she testified that she was "relying on personal experience" during her testimony about the staffing levels. (Doc. 901 at 31.) And while she did not know what the individual assignments were for the electronic surveillance division in Atlanta during the COVID staffing changes, she testified consistently during both hearings that the team would have been on a split "blue-gold" schedule, when allowed in the office at all. (Compare doc. 836 at 43-44 with doc. 901 at 32.) Because Solomon did not directly contradict her testimony from Holland's hearing when she subsequently testified during Parrish's hearing, her subsequent

part of the record in Holland's case.

5

testimony does not contradict the Magistrate Judge's findings, and certainly does not make those findings erroneous.

Holland also argues that the Magistrate Judge did not address that the "only untimely sealing of the nine wiretaps was in connection with TT8—which makes it much more implausible that the pandemic staffing was the cause of the delay in sealing." (Doc. 918 at 6.) After reviewing Solomon's testimony, this Court agrees with the Magistrate Judge that the Government's proffered explanation is plausible, and that it is a satisfactory explanation for the delay in sealing the recordings from TT8.

Finally, Holland objects to the Magistrate Judge's recommendation that his Motion to Suppress the Search Warrant be denied, since that recommendation was based on the analysis of the sufficiency of the wiretaps. (Doc. 910 at 6.) Since this Court agrees with the Magistrate Judge's findings as to the wiretap of TT8, it also agrees with the Magistrate Judge's findings as to the search warrant.

The Court, therefore, **ADOPTS** the Report and Recommendation, (doc. 823), as the opinion of the Court and **DENIES** defendant's Motion to Suppress Title III Wiretap Evidence, (doc. 626), and **DENIES** defendant's Motion to Suppress Search Warrant Issued for Target Cell Phone: 912-398-6253, (doc. 627).

**SO ORDERED**, this 16th day of December, 2021.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA